UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X

LARRY BIASI,                                   :
                                               :          Case No.: _____
                 Plaintiff,                    :
                                               :          **COMPLAINT**
        -against-                              :
                                               :          **DEMAND FOR JURY TRIAL**
CAESARS ENTERTAINMENT                          :
CORPORATION, JAMES HUNT, ANTHONY               :
RODIO, THOMAS BENNINGER, JULIANA               :
L. CHUGG, DENISE CLARK, KEITH                  :
COZZA, JOHN DIONNE, DON KORNSTEIN,             :
COURTNEY MATHER, JAMES L. NELSON,              :
and RICHARD SCHIFTER,                          :
                                               :
                 Defendants.                   :
-------------------------------------- X

Plaintiff, Larry Biasi ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is an action brought by Plaintiff against Caesars Entertainment Corporation ("Caesars" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Caesars, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Item 1015 of Regulation M-A, 17 C.F.R. 229.1015, in connection with the proposed merger (the "Proposed Merger") between Caesars and ERI Resorts, Inc. ("ERI").

2.     On June 24, 2019, Caesars entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which the Company's shareholders will receive $8.40 per share in cash consideration and 0.0899 shares of ERI common stock in exchange for each share of

Caesars common stock they own (the "Merger Consideration"). Giving effect to the transaction, ERI and Caesars shareholders will hold approximately 51% and 49% of the combined company's outstanding shares, respectively.[1]

3.    On September 3, 2019, in order to convince Caesars's shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading joint proxy statement/prospectus on Form S-4 (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.    In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Caesars, ERI, and the combined company; (ii) the valuation analyses performed by Caesars's financial advisor, PJT Partners LP ("PJT"), in support of its fairness opinion; (iii) the conflicts of interest faced by PJT; and (iv) the background of the Proposed Merger.

5.    The special meeting of Caesars shareholders to vote on the Proposed Merger is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed prior to special meeting of Caesars's shareholders to vote on the Proposed Merger so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Caesars's shareholders sufficiently in advance of the special meeting of Caesars's shareholders or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

---

[1]    In connection with the execution of the Merger Agreement, ERI entered into the Master Transaction Agreement with VICI, described in greater detail below.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

9.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, multiple meetings throughout the sales process were held in in this District. Moreover, Caesars's common stock trades on Nasdaq stock exchange, which is headquartered in this District, and Caesars hired Skadden, Arps, Slate, Meagher & Flom LLP as a legal advisor and PJT as a financial advisor for the purposes of the Proposed Merger, both of which are also headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.      Plaintiff is, and at all relevant times has been, a holder of Caesars common stock.

11.    Defendant Caesars is incorporated in Delaware and maintains its principal executive offices at One Caesars Palace Drive, Las Vegas, Nevada 89109. Caesars s primarily a holding company operating fifty-four properties, including fifty casino properties. The Company's common stock trades on the Nasdaq under the ticker symbol "CZR".

12.    Individual Defendant James Hunt is, and has been at all relevant times, a director of Caesars and Chairman of the Board.

13.    Individual Defendant Anthony Rodio is, and has been at all relevant times, a director of Caesars and the Chief Executive Officer of the Company.

14.    Individual Defendant Thomas Benninger is, and has been at all relevant times, a director of Caesars.

15.    Individual Defendant Juliana L. Chugg is, and has been at all relevant times, a director of Caesars.

16.    Individual Defendant Denise Clark is, and has been at all relevant times, a director of Caesars.

17.    Individual Defendant Keith Cozza is, and has been at all relevant times, a director of Caesars.

18.    Individual Defendant John Dionne is, and has been at all relevant times, a director of Caesars.

19.    Individual Defendant Don Kornstein is, and has been at all relevant times, a director of Caesars.

20.    Individual Defendant Courtney Mather is, and has been at all relevant times, a director of Caesars.

21.    Individual Defendant James L. Nelson is, and has been at all relevant times, a director of Caesars.

22.     Individual Defendant Richard Schifter is, and has been at all relevant times, a director of Caesars.

23.     The Individual Defendants referred to in ¶¶ 12-22 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Caesars they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.     The Proposed Merger

24.     Caesars is a holding company providing casino-entertainment and hospitality services. The Company's segments include Caesars Entertainment Resort Properties, LLC (CERP), Caesars Growth Partners, LLC (CGP), and Other. The Company's resorts operate primarily under the Harrah's, Caesars, and Horseshoe brand names. The Company also owns the London clubs international family of casinos. The Company's facilities include gaming offerings, food and beverage outlets, hotel and convention space, and non-gaming entertainment options.

25.     ERI is a gaming and hospitality company with twenty-six gaming facilities in twelve U.S. states as of the date of the Proxy. ERI's properties, which are located in Ohio, Louisiana, Nevada, New Jersey, West Virginia, Colorado, Florida, Iowa, Mississippi, Illinois, Indiana, and Missouri, feature approximately 28,000 slot machines and video lottery terminals, approximately 750 table games, and approximately 12,600 hotel rooms. ERI's primary source of revenue is generated by gaming operations, and ERI utilizes its hotels, restaurants, bars, entertainment, racing, retail shops, and other services to attract customers to its properties. ERI was founded in 1973 in Reno. ERI has been publicly traded since September 22, 2014 and its common stock currently trades on NASDAQ under the symbol "ERI."

26.     On June 24, 2019, Caesars and ERI issued a joint press release announcing the Proposed Merger, which states in relevant part:

**Eldorado to Combine With Caesars Creating the Largest Owner and Operator of U.S. Gaming Assets**

- *COMBINES ICONIC GLOBAL BRANDS AND INDUSTRY-LEADING LOYALTY PROGRAM WITH EXCEPTIONAL GUEST SERVICES AND OPERATIONAL EXCELLENCE*
- *INCREASED SCALE AND GEOGRAPHIC DIVERSIFICATION ACROSS APPROXIMATELY 60 DOMESTIC GAMING PROPERTIES*
- *IDENTIFIED SYNERGIES OF $500 MILLION WITH LONGER-TERM UPSIDE*
- *$3.2 BILLION STRATEGIC TRANSACTION WITH VICI PROVIDES SIGNIFICANT PROCEEDS FROM LEASE MODIFICATIONS AND REAL ESTATE MONETIZATION*
- *EXPECTED TO BE IMMEDIATELY ACCRETIVE TO FREE CASH FLOW*
- *CONTINUED OWNERSHIP OF REAL ESTATE ACROSS BOTH PORTFOLIOS PRESERVES INHERENT VALUE*
- *ELDORADO'S CHAIRMAN GARY CARANO, CEO TOM REEG, COO, CFO AND CLO WILL LEAD THE COMBINED COMPANY, WHICH WILL USE THE CAESARS NAME*
- *COMPANY TO BE HEADQUARTERED IN RENO, NEVADA AND WILL RETAIN SIGNIFICANT CORPORATE PRESENCE IN LAS VEGAS*

June 24, 2019 06:00 AM Eastern Daylight Time

RENO, Nev. & LAS VEGAS--(BUSINESS WIRE)--Eldorado Resorts, Inc. (NASDAQ: ERI) ("Eldorado," "ERI," or "the Company") and Caesars Entertainment Corporation (NASDAQ: CZR) ("Caesars") announced that they have entered into a definitive merger agreement to create the largest U.S. gaming company. The proposed transaction will combine two leading gaming companies with complementary national operating platforms, strong brands, strategic industry alliances, and a collective commitment to enhancing guest service and shareholder value. The combined company will provide its guests with access to approximately 60 domestic casino–resorts and gaming facilities across 16 states. The transaction is transformational for each company's shareholders, employees and customers, combining Eldorado's operational expertise with Caesars industry-leading loyalty program, regional network and Las Vegas assets.

"This announcement is the culmination of a thorough evaluation by the Caesars Board of Directors. The Board unanimously concluded that the combination of these two companies creating an even stronger entity is a decision for our shareholders' consideration and vote for immediate and ongoing value."

**Summary of Caesars Transaction**

Eldorado will acquire all of the outstanding shares of Caesars for a total value of $12.75 per share, consisting of $8.40 per share in cash consideration and 0.0899 shares of Eldorado common stock for each Caesars share of common stock based on Eldorado's 30-calendar day volume weighted average price per share as of May

23, 2019, reflecting total consideration of approximately $17.3 billion, comprised of $7.2 billion in cash, approximately 77 million Eldorado common shares and the assumption of Caesars outstanding net debt (excluding face value of the existing convertible note). Caesars shareholders will be offered a consideration election mechanism that is subject to proration pursuant to the definitive merger agreement. Giving effect to the transaction, Eldorado and Caesars shareholders will hold approximately 51% and 49% of the combined company's outstanding shares, respectively.

Upon completion of the transaction the combined company will retain the Caesars name to capitalize on the value of the iconic global brand and its legacy of leadership in the global gaming industry. The new company will continue to trade on the Nasdaq Global Select Market.

**Strategic Rationale of Caesars Combination**

- **Largest and Most Diversified Domestic Footprint and Scale**: Unrivaled domestic footprint of approximately 60 owned, operated and managed casino–resorts across 16 states, creating nation's preeminent diversified gaming and entertainment company
- **Best-in-Class Leadership**: Eldorado's proven decentralized operating model combined with its history of completing successful, value-building transactions through effective financial management to drive improved margins and create value for both shareholders and guests
- **Iconic Brands and New Gaming Opportunities Will Enhance Customer Experience**: Combines iconic global brands and industry-leading Caesars Rewards loyalty program with proven guest service focus to drive value across the expanded regional network, including access to attractive properties in Las Vegas and other gaming markets around the country
- **Completion of Las Vegas Strip Room Remodels in 2021**: Caesars Las Vegas asset portfolio has recently undergone $1.2 billion of enhancements and room remodels that positions the portfolio for improved operating performance in the near-term
- **Significant Identified Synergies**: Eldorado management has a demonstrated track record of successfully integrating acquired companies and achieving stated synergy targets and expects to achieve approximately $500 million of synergies in the first year following closing. Additionally, Eldorado sees long-term cost and revenue synergy upside opportunities

**Summary of $3.2 Billion Strategic Transaction with VICI**

VICI Properties, Inc. (NYSE: VICI) ("VICI") and Eldorado have entered into a master transaction agreement in connection with the acquisition of the real estate of three assets and amendment of existing leases and right of first refusals. Furthermore, in connection with the transaction, the parties have agreed to the following:

- VICI will acquire the real estate associated with Harrah's Resort Atlantic City, Harrah's Laughlin Hotel & Casino, and Harrah's New Orleans Hotel

& Casino for approximately $1.8 billion. The properties will be added to an existing master lease and will have an initial annual rent of approximately $154 million. The proceeds from this transaction represent a rent multiple of 11.75x;

- An amendment to the terms of the existing CPLV and HLV single asset leases, following closing of the transaction, which will result in a combination of these existing leases into a new Las Vegas master lease and an increase in the annual rent payment on the Las Vegas master lease of $98.5 million, resulting in proceeds of approximately $1.4 billion. The proceeds represent a rent multiple of 14.25x;
- A put/call option on Caesars Centaur assets at a 12.5x put rent multiple / 13.0x call rent multiple, exercisable between January 2022 and December 2024; and,
- VICI granted right of first refusals for whole asset sale or sale-leaseback transactions on two Las Vegas Strip properties and Horseshoe Casino Baltimore

**Optimized Lease Structure and Balance Sheet**

- **Win-Win Transaction with VICI**: Strategic transaction with VICI encompassing amendments to existing leases and acquisition of the real estate of three properties generates $3.2 billion of gross proceeds to immediately strengthen the combined company's balance sheet, while providing growth for VICI
- **Attractive Financial Profile**: Materially enhanced financial scale and flexibility with additional growth and stability driven by the world's largest gaming customer database
- **Commitment to a Strong Balance Sheet**: Transaction expected to be immediately accretive to free cash flow with significant cash flows from the combined company to be allocated to leverage reduction

**Tom Reeg, Chief Executive Officer of Eldorado**, commented, "Eldorado's combination with Caesars will create the largest owner and operator of U.S. gaming assets and is a strategically, financially and operationally compelling opportunity that brings immediate and long-term value to stakeholders of both companies. Together, we will have an extremely powerful suite of iconic gaming and entertainment brands, as well as valuable strategic alliances with industry leaders in sports betting and online gaming. The combined entity will serve customers in essentially every major U.S. gaming market and will marry best-of-breed practices from both entities to ensure high levels of customer satisfaction and significant shareholder returns.

"As with our past transactions, we have a detailed plan for significant synergy realization. Relative to our prior acquisitions, the combination with Caesars presents attractive incremental revenue synergy opportunities as we plan to strengthen Caesars Rewards, the industry's leading player loyalty and CMS database, and combine it with Eldorado's to market to over 65 million rewards customers nationally. Additionally, the transaction bears benefits beyond the

strategic merits of the combination with Caesars in isolation. Our agreement with VICI favorably positions both platforms by enhancing the value of our combined company's assets and further solidifies the growth profile of VICI.

"Eldorado's history of completing successful, value-enhancing transactions has focused on prioritizing operating discipline with the goal of delivering best-in-class gaming and entertainment experiences and amenities to customers, unlocking the long-term value of acquired companies and assets through effective financial management, and completing return-focused investments in our properties that elevate the guest experience as well as our competitive position and overall returns. We intend to allocate the significant free cash flow from the combined company to reduce leverage while investing to improve the customer experience across the platform. We could not be more excited about the future as we bring together two industry leaders that will generate significant opportunities for our employees, customers, partners and shareholders."

**Jim Hunt, Chairman of Caesars, said**, "This announcement is the culmination of a thorough evaluation by the Caesars Board of Directors. The Board unanimously concluded that the combination of these two companies creating an even stronger entity is a decision for our shareholders' consideration and vote for immediate and ongoing value."

**Tony Rodio, Chief Executive Officer of Caesars, added**, "We believe this combination will build on the accomplishments and best-in-class operating practices of both companies. I'm familiar with Eldorado and its management team, having worked with them on a previous transaction, and I look forward to collaborating with them to bring our companies together. We are excited to integrate Caesars Rewards with the combined portfolio. The incorporation of Caesars Rewards has produced strong results at the recently acquired Centaur properties. By joining forces, we believe the new Caesars will be well-positioned to compete in our dynamic industry."

**Ed Pitoniak, Chief Executive Officer of VICI, said**, "VICI is honored and excited to be integrally involved with Eldorado in this transformative transaction. As a REIT, we seek to partner with operators who have the most powerful, valuable and enduring relationships with the end users of our real estate. Under Tom Reeg's leadership and front-line focus, the combination of Eldorado and Caesars will yield the most compelling guest experiences and network effect in American gaming."

**Governance and Timing**

- The combined company's Board of Directors will consist of 11 members, six of whom will come from Eldorado's Board of Directors and five of whom will come from Caesars Board of Directors

- The transactions have been unanimously approved by the Boards of Directors of Eldorado, Caesars and VICI. The Caesars transaction is subject to approval of the stockholders of Eldorado and Caesars, the approval of

applicable gaming authorities, the expiration of the applicable Hart-Scott-Rodino waiting period and other customary closing conditions, and is expected to be consummated in the first half of 2020.

27.     The Merger Consideration represents inadequate compensation for Caesars shares. Given the Company's strong recent financial performance and bight economic outlook, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

## II.     The Proxy Omits Material Information

28.     On September 3, 2019, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents an/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

The Misleadingly Incomplete Financial Projections

29.     First, the Proxy discloses a single and generic run-rate synergy metric but fails to provide the "financial analyses, estimates and forecasts prepared by the management of ERI and approved by the management of Caesars (under the supervision of Caesars Transaction Committee) with respect to the pro forma impact of the Merger on the future financial performance of the combined company, including cost savings and operating synergies" (the "Pro Forma Financial Information"). Proxy at 156. In connection with rendering their fairness opinion and performing its underlying financial analyses, PJT explicitly reviewed the Pro Forma Financial Information and held discussions with the senior managements of both Caesars and ERI.

30.     Additionally, on pages 150-155 of the Proxy, the Board listed the "material" positive factors for recommending Caesars shareholders vote in favor of the Proposed Merger, including the following:

- the strategic advantages of a combination with ERI compared to Caesars continuing as a standalone company, including the following:

  - the anticipated synergies to be realized in combining the two companies, including corporate, marketing, operational and revenue synergies;

  - the substantial expertise and experience of ERI's management team in the gaming industry and the business practices of ERI, including ERI's decentralized approach to management;

  - the larger size of the combined company, together with anticipated cost synergies, is expected to result in lower general and administrative expenses relative to its asset base;

  - in light of the regulatory, financial and competitive challenges facing industry participants (including the fact that the Las Vegas market has historically been disproportionately adversely impacted during recessions compared to regional gaming markets), the likelihood that the combined company would be better positioned to meet such challenges if the expected strategic and financial benefits of the transaction were fully realized; and

  - the potential increase in liquidity of ERI common stock following consummation of the Merger, as compared to Caesars' common stock, due to a less concentrated ownership base;

Proxy at 151.

31.     The Pro Forma Financial Information served as a primary reason for the Board to approve and recommend the Proposed Merger and for PJT to find the Merger Consideration "fair" to Caesars shareholders. The Pro Forma Financial Information is plainly material and speak squarely to the question that the Company's shareholders must answer in determining how to vote on the Proposed Merger: is a smaller stake in the combined company more or less valuable than a full stake in the standalone company? Without the Pro Forma Financial Information, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Merger.

32.     Second, the Proxy omits critical financial projections, including the net income projections for Caesars, ERI, and the pro forma combined company (the "Net Income Projections"). Defendants elected to summarize the projections for Caesars, ERI, and a synergy metric of the combined company in the Proxy, but they excised and failed to disclose the Net Income Projections. By disclosing these projections in the Proxy and withholding the Net Income Projections, Defendants render the tables of projections on pages 164-167 of the Proxy materially incomplete and provide a misleading valuation picture of Caesars, ERI, and the combined company.  Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

33.     Third, the Proxy fails to provide adequate background information concerning Caesars' disclosed financial projections, including the earlier sets of projections. Indeed, the projections were updated numerous times within a short period of time. Without more information including the earlier iterations of the projections, shareholders are unable to determine whether these revisions were done for legitimate reasons in the course of business, or to justify the forthcoming, unfair Merger Consideration. Further, the Proxy fails to provide sufficient details concerning the "Recession Case" and "Alternative Case" projections, including how they differ from the Base Case and why they were created.

34.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly,

Defendants have disclosed some of the projections relied upon by PJT and the Board but have omitted the Pro Forma Financial Information, the Net Income Projections, and the background information to the Caesars projections. These omissions render the projections disclosed and the summary of the Board's *Reasons for the Merger* included in the Proxy misleading.

The Misleadingly Incomplete Summary of PJT's Fairness Opinion

35. The Proxy describes PJT's fairness opinion and the various valuation analyses performed in support of their opinions. Defendants concede the materiality of this information in citing PJT's fairness opinion and its valuation analyses among the "material" factors the Board considered in making its recommendation to Caesars shareholders. Proxy at 152; *see also* Proxy at 158 ("The following is a summary of the material financial analyses used by PJT Partners in preparing its opinion to the Caesars Board."). However, the summary of PJT's fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Caesars's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on PJT's fairness opinion in determining how to vote on the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Caesars's shareholders.

36. In summarizing the *Discounted Cash Flow Analysis* prepared by PJT, the Proxy fails to disclose the following key information used in the analysis: (i) the actual inputs and assumptions underlying the discount rate range of 8.75% to 9.25% (including the values of the WACC and CAPM components); (ii) the actual terminal values calculated; (iii) the value of the net debt and minority interests used to adjust Caesars's equity value; and (iv) the value of Caesars' equity ownership in the Baltimore joint venture used to further adjust Caesars's equity value.

37. These key inputs are material to Caesars shareholders, and their omission renders

the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

38.     Without the above-omitted information Caesars shareholders are misled as to the reasonableness or reliability of PJT's analysis, and unable to properly assess the fairness of the Proposed Merger.  As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleading.

39.     Next, in summarizing PJT's *Selected Precedent Transaction Analysis*, the Proxy fails to disclose the identity of each transaction utilized in the analysis and their corresponding individual multiples. A fair summary of a comparable companies or transactions analysis requires the disclosure of the identity of, and individual multiple for, each company or transaction used. Merely providing the mean value of the multiples that a banker applied without any further

information is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Proxy misleading.

40.     Finally, the Proxy indicates that PJT reviewed the Pro Forma Financial Information in the process of preparing its fairness opinion but fails to provide a summary of any ERI or pro forma analysis. Moreover, the Proxy states that on May 16 PJT presented "views on ERI's standalone valuation and more refined views on proposed illustrative transaction package value using the amount of synergies provided by management in connection with its due diligence." However, no such valuation analyses concerning either ERI or the combined company appear in the purported summary included in the Proxy. Given the ERI common stock component of the Merger Consideration, such information is unquestionably important to Caesars shareholders, speaks directly to the value of the Merger Consideration, and must be disclosed.

PJT's Conflicts of Interest

41.     The Proxy fails to disclose the amount of compensation PJT received for its previous investment banking and/or financial services performed for Caesars. Disclosure of any "relationship that existed during the past two years or is mutually understood to be contemplated *and any compensation received or to be received* as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4) (emphasis added). Such information is undoubtedly material to Caesars shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important

economic motivations that the advisor, employed by a board to assess the fairness of the transaction to the shareholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to shareholders.

42.    On page 164 the Proxy plainly states "During the two years preceding the date of PJT Partners' opinion, PJT Partners advised Caesars and its affiliates in connection with (i) Caesars' restructuring, for which PJT Partners received customary compensation, and (ii) certain transactions with VICI Properties Inc., for which PJT Partners received customary compensation." Yet, inexplicably, the Proxy fails to disclose the amount of compensation PJT received in connection with such services. Similarly, the Proxy states, "In addition [to the $28.5 million paid upon the consummation of the Proposed Merger], at the sole discretion of Caesars, a discretionary fee may be payable to PJT Partners upon the closing of the Merger." Again, the Proxy fails to disclose the amount of compensation PJT stands to receive from ths "discretionary fee," or the circumstances under which it will be paid. These omissions fly in the face of the disclosure requirements of the Exchange Act and mislead shareholders as to the nature of PJT's relationship with Caesars and the conflicts of interests PJT faces. Therefore, the omission of the amount of compensation PJT received or stands to receive renders the statements provided on page 164 of the Proxy, and potentially the PJT's fairness opinion, incomplete and misleading, and in violation of Item 1015.

The Misleading Summary of the Background of the Proposed Merger

43.    The Proxy provides a purported summary of the *Background of the Merger*; however, the account is replete with half-truths and misrepresentations. Once a proxy statement travels down the road of partial disclosure of the history leading up to a merger the duty of

disclosure requires Defendants to provide shareholders with an accurate, full, and fair characterization of those historic events. Accordingly, the failure to disclose complete and accurate details informing shareholders of the following information renders multiple statements on pages 136-140 of the Proxy summarizing the sales process leading up to the Proposed Merger misleadingly incomplete.

44.     First, the Proxy makes multiple references to an unnamed financial advisor in addition to PJT. The Board hired them for the purpose of dealing with this sales process and relied upon their guidance and expertise in executing the Proposed Merger. Yet the Proxy fails to identify this mysterious "financial advisor of global recognition" much less any relationships they might have creating conflicts of interest in the sales process. With so many painstakingly defined terms and parties, this this unidentified financial advisor is conspicuous to say the least. The identity of this second financial advisor as well as any relationships they may have to other parties involved or affiliated with the Proposed Merger is material information rendering the description of their participation in the merger process misleadingly incomplete.

45.     Second, the Proxy indicates that Caesars and multiple parties entered into non-disclosures containing standstill agreements, but fails to disclose whether those agreements contained a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect. Page 200 of the Proxy states that "neither Caesars and its subsidiaries, on the one hand, nor ERI and its subsidiaries, on the other hand, will release any third party from, or waive, amend or modify any provision of, or grant permission under any (i) standstill provision in any contract to which Caesars or any of its subsidiaries or ERI or any of its subsidiaries, as applicable, is a party or (ii) confidentiality provision in any contract to which Caesars or any of its subsidiaries or ERI or any of its subsidiaries, as applicable, is a party and (b) each of ERI and Caesars will, and will cause

its subsidiaries to, enforce the confidentiality and standstill provisions of any such contract." This indicates that not only standstill provisions, but also DADWs were in effect after the signing of the Merger Agreement.

46.     Accordingly, the express communication of the existence of such provisions is material to Caesars shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal.  The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. If those non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the descriptions of the non-disclosure agreements the Company entered into in the *Background of the Merger* section of the Proxy misleading.  Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

47.     Third, on September 3, 2019, Individual Defendant Schifter informed the Company that he would resign from his position as a director of Caesars. Defendants must disclose why Schifter resigned the very same day the Proxy was filed.

48.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming special meeting of Caesars shareholders, Plaintiff will be unable to make an informed decision regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

51.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

52.     Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

53.     The omission of information from a proxy will violate Section 14(a) if other SEC

19

regulations specifically require disclosure of the omitted information.

54.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Caesars, ERI, and the combined company; (ii) the valuation analyses performed by PJT in support of its fairness opinion; (iii) the conflicts of interest faced by PJT; and (iv) the background of the Proposed Merger.

55.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

56.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that PJT  reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by PJT, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the

material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review PJT's analyses in connection with their receipt of the fairness opinion, question PJT as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

58.     Caesars is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

59.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of Caesars's shareholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

60.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Caesars within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

64.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The

Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of Caesars shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 13, 2019                **MONTEVERDE & ASSOCIATES PC**

       */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*